UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE LEE,

       Plaintiff,

vs.

OUELLETTE MSP, et al.,

       Defendants.
_____/

Civil Action No.
08-CV-10220

HON. BERNARD A. FRIEDMAN

### OPINION AND ORDER ACCEPTING AND ADOPTING THE MAGISTRATE JUDGE'S APRIL 4, 2008, REPORT AND RECOMMENDATION AND *SUA SPONTE* DISMISSING PLAINTIFF'S COMPLAINT

       This matter is presently before the Court on Magistrate Judge Charles E. Binder's Report and Recommendation ("R&R") dated April 4, 2008. In his R&R, Magistrate Judge Binder recommends that Plaintiff's Complaint be dismissed, *sua sponte*, pursuant to 28 U.S.C. §§ 1915A(b), 1915e(2)(B), and 42 U.S.C. § 1997e(c)(1) because it fails to state a claim upon which relief may be granted. Plaintiff filed timely objections to the Magistrate Judge's R&R on April 16, 2008. The Court reviews *de novo* those portions of the R&R to which a specific objection has been made. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). After having done so, the Court finds that Magistrate Judge Binder correctly and thoroughly analyzed all of the issues presented and that he reached the proper conclusions for the proper reasons. Therefore, the Court will accept and adopt the Magistrate Judge's recommendations as the findings and conclusions of the Court.

       Plaintiff, who during the time frame at issue was a prison inmate in the custody of the Michigan Department of Corrections, alleges that his Eighth Amendment rights were violated

1

because Defendants waited too long to bring him to a doctor who was qualified to remove the "bleeding bump" on his back. However, it is undisputed that Plaintiff first brought his medical problem to the attention of prison officials on March 6, 2007, and that the matter was remedied four weeks later, on April 7, 2006, when a doctor surgically removed Plaintiff's bump. Moreover, as Magistrate Judge Binder pointed out in his R&R, "Plaintiff's own description of the events reveals that he received medical attention from Defendants Peterson, Pula, and Ouellette at least eight times during the one-month period . . ." R&R at 7-8. On average, then, Plaintiff was seen by medical staff approximately once every four days while his condition persisted.

In addition, the Court finds that Plaintiff's description of the events reveals that Defendants did not exhibit a "deliberate indifference" to his medical needs. Plaintiff, in his Complaint, alleges the following sequence of events:

- On March 6, 2007, Plaintiff first saw Defendant Nurse Peterson about the bump on his back. Defendant Nurse Peterson told Plaintiff to "keep [the bump] covered and let water run on it, but don't wash it or touch it." Plaintiff was also told to "put in another kite" if his condition worsened. (Compl. at ¶ 9.)

- On March 14, 2007, Plaintiff returned to health services because the bump had grown in size and continued to bleed. Plaintiff was again seen by Defendant Nurse Peterson, who measured the bump, gave Plaintiff a bandage, and told him to keep the wound covered. Defendant Nurse Peterson also gave Plaintiff antibiotic ointment to apply to his wound and told Plaintiff that he will have Defendant Ouellette examine it. Defendant Nurse Peterson then told Plaintiff, once again, to "put another kite in" if his condition worsened. (*Id*. at ¶ 10.)

- A week later, on March 21, 2007, before being examined by Defendant Ouellette, Plaintiff returned to health services and told Defendant Nurse Peterson that he noticed green fluid leaking from his bump, and that it bled excessively while in the shower. Plaintiff also stated that he believed the antibiotic ointment was making it worse. Defendant Nurse Peterson measured the bump once again and called in Defendant Nurse Pula to look at it. Defendant Nurse Peterson advised Plaintiff to discontinue use of the ointment, and stated that Defendant Ouellette will see him the next day. (*Id*. at ¶ 11.)

2

- The next day, Plaintiff was seen by Defendant Ouellette, who admitted that "she don't know what it is . . ." Defendant Ouellette then stated that she could remove the bump, but that she would rather someone with "more experience" perform the procedure. Defendant Ouellette further stated that she wanted to "see how large it will grow or see if it will stop growing." (*Id*. at ¶ 12.)

- An unspecified number of days later (presumably between March 23, 2007, and March 27, 2007), Plaintiff was seen on two separate occasions by the prison's medical staff because his wound continued to grow and bleed through his bandages. On the first occasion, Plaintiff was examined by Defendant Ouellette, who took pictures of Plaintiff's wound and promised to "contact Lansing and see what they say to do for the Plaintiff [sic] condition . . ." Defendant Ouellette assured Plaintiff that she would contact him with any news from Lansing. Additionally, Defendant Ouellette "opened a book and showed Plaintiff . . . different pictures of bumps and pointed at one and stated she thinks Plaintiff has the one called (Dermal Nevus' and its growing vascular, but not to worry [sic]." (*Id*. at ¶ 13.)

- On the second occasion, Plaintiff was seen by Defendant Nurse Peterson, who gave Plaintiff more bandages and advised that he keep the wound covered. Plaintiff also spoke to Defendant Ouellette, who stated that she "forgot" to contact Lansing, but that she will as soon as possible. (*Id*. at ¶ 14.)

- On March 28, 2007, "the bump on Plaintiff['s] . . . back had gotten accidently bumped somehow," causing it to bleed profusely. Plaintiff requested that he be brought to the hospital. After prison officials stopped the bleeding and bandaged Plaintiff's wound, they contacted the hospital and told them everything that had happened. A prison official then "told Plaintiff that if they want him to go to the Hospital they will call him back and let him know . . ." Plaintiff was not brought to the hospital that day. (*Id*. at ¶¶ 15-17.)

- The next day, on March 29, 2007, Plaintiff was examined by Defendant Nurse Pula, who called Defendant Ouellette and informed her of what had happened the day before. Defendant Ouellette told Defendant Nurse Pula to do a culture in order "to see if there's any infections . . ." (*Id*. at ¶ 18.)

- On April 2, 2007, Plaintiff woke up to find that "the left side of his upper back where the bump was at was numb." Plaintiff then took off the bandage and noticed dry blood and swelling. The next day, Plaintiff was again examined by Defendant Nurse Peterson, who offered Plaintiff Aspirins, but advised that he could do nothing further until hearing back from Lansing. (*Id*. at ¶¶ 19-20.)

- On April 7, 2007, Plaintiff began feeling light-headed because the bump had bled "massively" the night before and again during his morning shower. Plaintiff

3

could not eat. When he took off his shirt, another inmate informed him that he was bleeding through the bandage. "When [Plaintiff] took the bandage off[,] blood started running down his back rapidly. Plaintiff went to grab some tissue . . . and fell to one knee and blanked out for about 30 seconds . . ." After being helped up by another inmate, Plaintiff again felt dizzy and told a prison official that "it feels like the room [is] spinning around him." Soon thereafter, Plaintiff was brought to the hospital where his bump was surgically removed. (*Id*. at ¶¶ 21-24.)

Considering these facts in the light most favorable to Plaintiff and accepting them as true, the Court concludes that Defendants' actions constituted—at best—a good faith, sincere attempt to remedy Plaintiff's medical condition in a relatively timely manner, and at worst, negligence in diagnosing and treating Plaintiff's condition, which—as Magistrate Judge Binder noted in his R&R—is insufficient for a deliberate indifference claim. *See* R&R at 7. In his objections, Plaintiff states that "[n]othing was being done to correct [his] condition" and that "Health Care staff . . . did not act or take [his] condition serious [sic]." (Objections at 4.) Plaintiff also reiterates his belief that the bump on his back "was not being treated" and that "[t]his proves that medical staff prolonged and delayed proper treatment which could have resulted in death or permanent impairment." (*Id*. at 2.)

However, Plaintiff's own recitation of the facts does not support his conclusions. According to Plaintiff, Defendants (1) examined Plaintiff on eight occasions within a one-month time span; (2) told Plaintiff to "keep [the bump] covered and let water run on it, but don't wash it or touch it;" (3) took measurements of Plaintiff's bump on several occasions; (4) provided Plaintiff with bandages; (5) provided Plaintiff with antibiotic ointment; (6) decided against surgically removing the bump so that someone with more experience could perform the procedure; (7) told Plaintiff to notify prison staff if his condition should worsen; (8) attempted to diagnose Plaintiff's condition using a medical book; (9) performed a culture to check for infection; and (10) offered Plaintiff Aspirin. These actions do not support a claim that Defendants were "deliberately

4

indifferent" to Plaintiff's medical needs.

According to the United States Supreme Court, "[i]n order to state a cognizable claim [under the Eighth Amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). In other words, "Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Id*. (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*. at 837. Therefore, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id*. According to the Sixth Circuit,

> [r]epeatedly violating an objective standard of reasonableness does not necessarily mean that the official acted with "deliberate indifference" as defined in *Farmer*. The official may be incompetent, but he is not acting wantonly, and thus is not inflicting "punishment."

*Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir. 1994).

The main thrust of Plaintiff's Complaint is that Defendants unduly delayed his access to proper medical care. For example, Plaintiff alleges that Defendant Ouellette forgot to contact Lansing right away regarding his medical condition, and that "the bump . . . grew and bled daily before and after being seen numerous times by health care staff . . ." (Objections at 2.) However, given the actions taken by Defendants and their multiple efforts to alleviate and remedy Plaintiff's condition, Plaintiff's "deliberate indifference" claim clearly fails as a matter of law. No reasonable jury could conclude based on the allegations in the Complaint that Defendants "disregard[ed] an

5

excessive risk to [Plaintiff's] health and safety," *Farmer*, 511 U.S. at 837, thereby wantonly inflicting punishment upon Plaintiff. At worst, Defendants acted negligently in failing to resolve Plaintiff's medical matter more quickly. Therefore, even accepting Plaintiff's allegations as true, Defendants' actions did not rise to the level of an Eighth Amendment violation. Accordingly,

IT IS ORDERED that Magistrate Judge Binder's R&R dated April 4, 2008, is accepted and adopted.

IT IS FURTHER ORDERED that Plaintiff's Complaint is dismissed with prejudice pursuant to 28 U.S.C. §§ 1915A(b), 1915e(2)(B), and 42 U.S.C. § 1997e(c)(1).

s/Bernard A. Friedman
Bernard A. Friedman
United States District Judge

Dated: April 22, 2008

I hereby certify that a copy of the foregoing document was served upon George Lee and counsel of record on April 22, 2008, by electronic and/or ordinary mail.

s/Carol Mullins
Case Manager